630 P.2d 665

The STATE of Idaho,
Plaintiff-Respondent,

v.

Amelia P. GARCIA, Defendant-Appellant.

No. 12854.

Supreme Court of Idaho.

June 24, 1981.

Dean J. Miller and Dean E. Miller of Gigray, Miller, Downen & Weston, Caldwell, for defendant-appellant.

David H. Leroy, Atty. Gen., Michael B. Kennedy, Deputy Atty. Gen., Boise, for plaintiff-respondent.

McFADDEN, Justice.

In a two-count information, the State charged the defendant-appellant, Amelia P. Garcia, and Gilberto Flores with murder in the first degree and conspiracy to commit murder. The charges stemmed from the death by strychnine poisoning of Flores' wife, Maria, on September 25, 1976, in Caldwell, Idaho.

Count I of the information charged that Garcia and Flores, with premeditation and malice aforethought, murdered Maria by means of strychnine which Garcia disguised as medication and mailed to Maria at the request and direction of Flores.

Count II charged that between September 6 and 25, 1976, Garcia and Flores conspired to commit the crime of murder in the first degree, and that in furtherance of the charge of conspiracy Flores requested and directed Garcia to furnish by mail strychnine disguised as medication to Maria, and procured and mailed to Garcia three $100.00 money orders as payment for her participation.

Upon motion by Garcia's counsel, separate trials were granted. Thereafter Flores changed his plea from not guilty to guilty under the conspiracy count, and the State moved to have the first degree murder count dismissed as to him. The trial court was advised that consideration for this plea bargain was that Flores would testify for the State at Garcia's trial. The plea of guilty to the conspiracy count was accepted, the first degree murder count was dismissed, and on November 18, 1977, Flores was sentenced to one year imprisonment and fined $1,000.

Garcia's trial commenced on December 5, 1977, and ended on December 9, 1977. The key witness for the State was Gilberto Flores. Flores' testimony showed that he and his deceased wife had been close acquaintances of Garcia for some time. After his separation from Maria in September 1976, Flores testified that he called Garcia, at her home in Texas, on numerous occasions to discuss his marital problems. Flores further testified that he did not ask Garcia to assist him in killing his wife, but rather, the suggestion of poisoning his wife came from Garcia. Flores stated that he subsequently mailed Garcia three $100 money orders.

The second witness for the State was Mrs. Herrera, a cousin of Maria. Maria had moved in with Mrs. Herrera when she left Flores, and lived with her for about a week. On September 25, 1976, Mrs. Herrera re-

ceived in the mail a package for Maria. The trial court allowed, over objection, the testimony of Mrs. Herrera as to the addressee on the package and a general description of the package. Mrs. Herrera testified that the contents of the package consisted of a tube of cream and some "mejorales," i. e., homemade analgesic tablets or pills for colds and headaches. She was also allowed to testify, again over objection, as to statements made by Maria at that time. Specifically, Mrs. Herrera testified that Maria, upon opening the package, stated, "Look how nice the lady is, she even sent me mejorales."

Following Maria's death, Mrs. Herrera placed a call to a Texas phone number, and talked to Garcia. During the conversation, Garcia admitted to Mrs. Herrera that she had sent a package in the mail to Maria containing a tube of cream and some mejorales. When asked by Mrs. Herrera if Flores had sent her any money, Garcia denied that she had received any money from him.

The State also introduced circumstantial evidence obtained during the investigation of the death of Maria. In addition to the accomplice's testimony, there was the fact that Maria received a package containing mejorales from an unidentified sender on the date of her death, and that Garcia, while being interrogated by law enforcement officials, admitted receiving a money order in the sum of $100 from Flores. Upon this evidence, the State rested its case.

Garcia, in her defense, introduced evidence for the purpose of demonstrating the physical impossibility of the State's version of the case. The evidence was designed to show that strychnine could not have entered the body of Maria in combination with mejorales, and that it probably entered the body in combination with medication to which Gilberto Flores had access.

Subsequently, the jury returned verdicts of not guilty to the first degree murder count and guilty to the conspiracy count. Garcia then filed a motion for a judgment of acquittal, and alternatively, a motion for a new trial. Both motions were denied. Accordingly, on January 12, 1978, Garcia was adjudged guilty of conspiracy to commit murder in the first degree and sentenced to one year of imprisonment. On appeal, the judgment of conviction is affirmed.

■ Appellant first contends that the trial court erred in admitting into evidence, over objection, declarations of the murder victim. Specifically, Mrs. Herrera was allowed to testify that Maria, upon opening the package containing the tube of cream and mejorales, stated "Look how nice the lady is, she even sent me mejorales." The declaration is alleged to be hearsay and inadmissible under any recognized exception to the hearsay rule. See generally Isaacson v. Obendorf, 99 Idaho 304, 581 P.2d 350 (1978); Patino v. Grigg and Anderson Farms, 97 Idaho 251, 542 P.2d 1170 (1975).

At trial the declaration in issue was offered to prove Maria's state of mind, specifically that she did not expect or anticipate receiving mejorales from the appellant. In connection with this theory, it should be noted that on several prior occasions the appellant had provided the victim with tubes of facial cream. This being the case, the initial question which must be addressed is whether Maria's state of mind is relevant to any issue in the case.

In almost all cases, statements made by a murder victim to a third party prior to the fatal incident are held to be inadmissible as hearsay. See People v. Purvis, 56 Cal.2d 95, 13 Cal.Rptr. 801, 362 P.2d 713 (1961); People v. Ireland, 70 Cal.2d 522, 75 Cal.Rptr. 188, 450 P.2d 580 (1969); Kennedy v. State, 385 So.2d 1020 (Fla.App.1980); State v. Wauneka, 560 P.2d 1377 (Utah 1977); State v. Kump, 76 Wyo. 273, 301 P.2d 808 (1956). However, in State v. Goodrich, 97 Idaho 472, 546 P.2d 1180 (1976), this court held that in limited circumstances statements made by a murder victim to a third party will be admissible under the state of mind exception to the hearsay rule. In so holding, the court stated:

"[A] statement offered to show the state of mind of declarant-victim, may be admissible under the 'state of mind' exception to the hearsay rule, where the declarant-victim's state of mind is relevant to an issue involved in the criminal proceedings. As with the admissibility of any piece of evidence, where the probative value of the statement is substantially outweighed by the danger of unfair prejudice to the defendant, this evidence should be excluded." 97 Idaho at 477, 546 P.2d at 1185.

Thus, statements of a murder victim will be admitted only after a determination that the declaration is relevant, and that the need for and value of such testimony outweighs the possibility of prejudice to the accused.

In *Goodrich*, the court recognized that four rather well defined categories have developed in which the relevancy of such statements may overcome the possible prejudice of admitting hearsay testimony:

"Other states have found that a statement of fear of the defendant, made by the deceased victim to a third party, is relevant in a homicide case in the following instances: (a) when the defendant claims self-defense as justification for the killing. Where this defense is asserted, a defendant's contention that the deceased attacked him first, may be rebutted by extra-judicial declarations of the victim that he was afraid of the defendant, thus rendering it unlikely that the deceased was the aggressor in the first instance. *See People v. Schindler*, 273 Cal.App.2d 624, 78 Cal.Rptr. 633 (1969). (b) when the defendant seeks to build his defense around the fact that the deceased committed suicide. Evidence introduced which tends to demonstrate that the victim made statements inconsistent with a design to take his or her own life are relevant. *See Commonwealth v. DelValle*, 351 Mass. 489, 221 N.E.2d 922 (1966). (c) when the defendant claims the killing was accidental. *See People v. Lew*, 68 Cal.2d 774, 69 Cal.Rptr. 102, 441 P.2d 942 (1968). (d) when a specific 'mens rea' is in issue, e. g., was the killing

premeditated or not? *See People v. Hamilton*, 55 Cal.2d 881, 13 Cal.Rptr. 649, 362 P.2d 473 (1961): overruled on other grounds, *People v. Wilson*, 1 Cal.3d 431, 82 Cal.Rptr. 494, 462 P.2d 22 (1969)." 97 Idaho at 477, n. 7, 546 P.2d at 1185, n. 7.

A further discussion of the first three categories can be found in *United States v. Brown*, 490 F.2d 758, 767 (D.C.Cir. 1973), where it was observed:

"While there are undoubtedly a number of possible situations in which such statements may be relevant, the courts have developed three rather well-defined categories in which the need for such statements overcomes almost any possible prejudice. The most common of these involves defendant's claim of self-defense as justification for the killing. When such a defense is asserted, a defendant's assertion that the deceased first attacked him may be rebutted by the extrajudicial declarations of the victim that he feared the defendant, thus rendering it unlikely that the deceased was in fact the aggressor in the first instance. Second, where defendant seeks to defend on the ground that the deceased committed suicide, evidence that the victim had made statements inconsistent with a suicidal bent are highly relevant. A third situation involves a claim of accidental death, where, for example, defendant's version of the facts is that the victim picked up defendant's gun and was accidentally killed while toying with it. In such cases the deceased's statements of fear as to guns or of defendant himself (showing that he would never go near defendant under any circumstances) are relevant in that they tend to rebut this defense. Of course, even in these cases, where the evidence is of a highly prejudicial nature, it has been held that it must be excluded in spite of a significant degree of relevance."

In this case none of the foregoing purposes of admissibility supporting admission of such statements into evidence are present. The appellant's defense was never based on self-defense, accidental death, sui-

cide or the absence of a specific "*mens rea*." An examination of the transcript reveals that appellant's counsel carefully avoided any direct or cross examination of witnesses, introduction of evidence, or argument which would have raised these issues. Rather, the case was defended on the theory that Gilberto Flores murdered his wife through independent action, without the cooperation or knowledge of the appellant. As to this defense, the hearsay statement does have some relevance, albeit slight. The fact that the mejorales were unexpected arguably raises the inference that the appellant placed strychnine in the mejorales in furtherance of the conspiracy. However, even though the statement has some relevance to the case, its admission was erroneous.

■ Although the trial court erred in receiving the hearsay testimony of Mrs. Herrera, any inference of guilt from that testimony is overshadowed by the appellant's own inculpatory admission made to Mrs. Herrera. After the victim's death, Mrs. Herrera called the appellant at her residence in Texas. During their telephone conversation, Mrs. Herrera testified that the appellant admitted that she had sent a package containing cream and mejorales in the mail to the murder victim. Thus, it is our conclusion that any prejudicial effect attendant in the inadmissible hearsay statement is offset by the admission to the point where it becomes harmless error.

■ The appellant next argues that since the conspiracy to commit first degree murder count and the first degree murder count contain identical allegations and that identical evidence was offered to prove both counts, the jury in reaching its verdicts must have found the allegations of fact to be proven for one purpose, but for another purpose found identical allegations not to be proven. Such a result, the appellant suggests, is logically inconsistent, and should be recognized by the court as a ground for a new trial on the count of conspiracy to commit first degree murder.

The appellant acknowledges that the position she advances is in conflict with the

long standing rule articulated in *Dunn v. United States*, 284 U.S. 390, 52 S.Ct. 189, 76 L.Ed. 356 (1932), that inconsistent verdicts in and of themselves do not warrant reversal of a conviction and the granting of a new trial. However, it is pointed out by the appellant that there is a growing body of case law to the contrary. *See DeSacia v. State*, 469 P.2d 369 (Alaska 1970); *People v. Samora*, 188 Colo. 74, 532 P.2d 946 (1975); *People v. Armijio*, 176 Colo. 547, 491 P.2d 1384 (1971); *Robles v. People*, 160 Colo. 297, 417 P.2d 232 (1966). *See also*, Annot., 18 A.L.R.3d 259 (1968); Comment, "Inconsistency of Verdicts in a Federal Criminal Trial," 60 Columbia L.Rev. 999 (1960).

Although the continuing viability of the rule stated in *Dunn* is suspect, that issue must await consideration for another day, given the court's determination that the verdicts in the instant case are capable of reconciliation.

The first degree murder count in the amended complaint filed against the appellant reads in pertinent part as follows:

"That GILBERTO FLORES and AMELIA P. GARCIA on or about the 25th day of September, 1976, in the County of Canyon and State of Idaho, then and there being, did then and there wilfully, knowingly, intentionally, unlawfully, feloniously, deliberately, with premeditation and with malice aforethought, and with the intent then and there to kill and murder one MARIA FLORES, a human being, and by means of a certain poison, to wit: STRYCHNINE, which the said Defendant AMELIA P. GARCIA did disguise as medication and mail to the said MARIA FLORES at the specific request and direction of the Defendant, GILBERTO FLORES. That the said poison disguised as medication and mailed to MARIA FLORES in the manner aforementioned was thereafter and on or about the 25th day of September, 1976, taken and ingested by the said MARIA FLORES, causing serious, grievous and mortal injuries to the person and body of the said MARIA FLORES, from which injuries the said MARIA FLORES died in Canyon County,

State of Idaho, on or about the 25th day of September, 1976."

The conspiracy count contained in the same amended complaint reads in pertinent part as follows:

"That GILBERTO FLORES and AMELIA P. GARCIA on or about and between the 6th day of September, 1976, and the 25th day of September, 1976, in the County of Canyon and State of Idaho, then and there being, did then and there wilfully, knowingly, intentionally, and unlawfully conspire to commit a crime to wit: Murder in the First Degree in violation of Idaho Code Provision 18–4001, to wit: that the said GILBERTO FLORES and AMELIA P. GARCIA then and there being did then and there conspire to wilfully, knowingly, intentionally, unlawfully, feloniously, deliberately, with premeditation and with malice aforethought, and with the intent then and there to kill and murder one MARIA FLORES, a human being, by means of STRYCHNINE, disguised as medication. In furtherance of said conspiracy, the said AMELIA P. GARCIA did furnish, STRYCHNINE, disguised as medication, and mail it to the said MARIA FLORES, at the specific request and direction of the Defendant, GILBERTO FLORES, who, in furtherance of said conspiracy, did procure and mail to AMELIA P. GARCIA, three (3) ONE HUNDRED DOLLAR ($100.00) money orders as payment for AMELIA P. GARCIA'S participation in the said conspiracy."

The distinguishing element between the substantive offense of first degree murder and the preliminary offense of conspiracy to commit murder in the first degree is that of causation. It is axiomatic that a conspiracy is established upon proof beyond a reasonable doubt that there is an agreement between two or more individuals to accomplish an illegal objective, coupled with one or more overt acts in the furtherance of the illegal purpose accompanied by the requisite intent to commit the underlying substantive offense. *United States v. Oropeza*, 564 F.2d 316 (9th Cir. 1977), *cert. den.*, 434 U.S. 1080, 98 S.Ct. 1276, 55 L.Ed.2d 788. However, the crime of first degree murder, in the context of this case, requires that there be proof beyond a reasonable doubt of a proximate causation between the acts of the appellant in furtherance of the conspiracy to commit the murder of Maria Flores and the actual death of Maria. *See generally*, 40 C.J.S. Homicide § 11b.

The evidence adduced at trial clearly established that the appellant and Gilbert Flores conspired to murder Flores' wife, and committed several acts in furtherance of that plan.[1] However, the testimony of the toxicology expert, to the effect that the strychnine found in the murder victim's body did not enter her body in combination with mejorales,[2] creates a reasonable doubt as to whether the acts committed in furtherance of the conspiracy resulted in the actual death of Maria Flores.

1. The record discloses that Gilberto Flores testified that: (1) he and the appellant agreed to a plan whereby the appellant would sent some deadly substance to Flores' wife in exchange for $300.00; (2) the substance was to be sent in a package containing cream and other items; and (3) pursuant to the agreement he sent three $100.00 money orders to the appellant. Mrs. Herrera further testified that the appellant admitted to having sent a package containing cream and mejorales to the murder victim. On the basis of these facts, the jury could rationally believe that Flores and the appellant agreed to murder Flores' wife, committed several acts in furtherance of that plan and manifested the requisite intent to commit the murder of Flores' wife.

2. John Patterson Atchison, Associate Professor of Clinical Pathology at the University of Oregon, performed scientific tests on the mejorales as well as toxicological examinations of blood, liver and gastric samples taken from the murder victim's body. His tests of the mejorales showed that they contained two ingredients, namely aspirin and caffeine. Dr. Atchison also found that the samples taken from the murder victim's body contained no evidence of salicylates, the chemical base of aspirin.

Based upon these findings, Dr. Atchinson expressed the professional opinion that the strychnine found to be present in the murder victim's body during the autopsy could not have entered her body in combination with the ingredients of mejorales since he could find no trace of salicylates present in the body.

Thus, given that the two counts involve differing elements of proof, and that there exists a reasonable doubt whether the state met its burden of proof as to the distinguishing element, the jury's verdicts are reconcilable on a rational basis. The district court therefore was correct in denying the appellant's motion for a new trial on the conspiracy conviction.

The next issue on appeal to be considered is the appellant's contention that the State failed to sufficiently corroborate the testimony of the accomplice in this case, Gilberto Flores.

I.C. § 19–2117 provides that

"A conviction cannot be had on the testimony of an accomplice, unless he is corroborated by other evidence, which in itself, and without the aid of the testimony of the accomplice, tends to connect the defendant with the commission of the offense; and the corroboration is not sufficient, if it merely shows the commission of the offense, or the circumstances thereof."

In *State v. Emmons*, 94 Idaho 605, 495 P.2d 11 (1972), this court ruled that this statutory provision absolutely prohibits the conviction in a criminal case upon the uncorroborated testimony of an accomplice, even though the accomplice may be believable and his testimony establishes the accused's guilt beyond a reasonable doubt. The applicable standards for determining whether an accomplice's testimony is sufficiently corroborated to satisfy the requirements of I.C. § 19–2117 are set forth in *State v. Bassett*, 86 Idaho 277, 282, 385 P.2d 246, 248 (1963):

"It is not necessary that there be corroborating evidence concerning every material fact as to which the accomplice testified. The statute permits convictions upon the testimony of an accomplice with the limitation that the accomplice shall be corroborated by such other evidence as tends to connect the defendant with the commission of the crime, and hence the corroborative evidence must be independent of the testimony of the accomplice and connect or tend to connect the defendant with the commission of the crime charged. *State v. Brake*, 99 Or. 310, 195 P. 583; *State v. Gillum*, 39 Idaho 457, 228 P. 334; *State v. Proud*, 74 Idaho 429, 262 P.2d 1016; *State v. Orr*, 53 Idaho 452, 24 P.2d 679. Corroboration of an accomplice need only connect the accused with the crime, it may be slight, and need only go to one material fact. It may be entirely circumstantial. *State v. McCandless*, 70 Idaho 468, 222 P.2d 156. The jurors are the judges of the weight and credibility of the testimony under proper instructions."

In addition to these general standards this court has previously held that admissions or inconsistent statements on the part of an accused, although in themselves insufficient to warrant a conviction without corroboration, are admissible to corroborate the testimony of an accomplice. *State v. Larsen*, 81 Idaho 90, 337 P.2d 1 (1959); *State v. Brown*, 53 Idaho 576, 26 P.2d 131 (1933).

In the instant case, we conclude there was sufficient corroboration. The appellant made both an admission and inconsistent statements which, although slight and circumstantial, tend to connect her with the crime of conspiracy to commit first degree murder. Mrs. Herrera testified that following the victim's death, during a phone conversation with the appellant, the appellant admitted that she had sent a package containing cream and mejorales in the mail to the victim. In this phone conversation, the appellant also denied receiving any money from Gilberto Flores. However, in a subsequent conversation with law enforcement officials, the investigating officer testified, the appellant first denied receiving any money from Gilberto Flores, and then admitted receiving one of the money orders.

The next issue to be considered on appeal is whether the appellant was denied due process of law as a result of the State's procurement of the accomplice's testimony through a plea bargain by which the accomplice was permitted to enter a plea of guilty to a charge substantially disproportionate to the original charge. In the instant case, in return for the accomplice's testimony

against the appellant, the State reduced the original charge against the accomplice from first degree murder, a felony carrying the potential penalty of death upon conviction, to conspiracy to commit first degree murder, a misdemeanor carrying the maximum penalty of one year imprisonment and a fine of $1,000 upon conviction. The appellant argues that this drastic reduction of charges in exchange for the accomplice's testimony created an irresistible incentive for the accomplice to testify on behalf of the State, and the testimony of the accomplice is consequently tainted. The argument is without merit.

 The court is in agreement with the well-recognized rule that an accomplice's testimony is admissible notwithstanding the fact that the testimony is procured by means of a plea bargain. The promise of leniency or otherwise favorable prosecutorial treatment goes only to the credibility of the accomplice's testimony, not to its admissibility. See *Giglio v. United States*, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972); *McDonald v. State*, 249 Ark. 506, 459 S.W.2d 806 (1970); *People v. Chandler*, 262 Cal.App.2d 350, 68 Cal.Rptr. 645 (1968), *cert. den.*, 393 U.S. 1043, 89 S.Ct. 670, 21 L.Ed.2d 591 (1969); *Peel v. State*, 154 So.2d 910 (Fla.App.1963); *Evans v. State*, 222 Ga. 392, 150 S.E.2d 240 (1966), *cert. den.*, 385 U.S. 953, 87 S.Ct. 336, 17 L.Ed.2d 231 (1966); *People v. West*, 54 Ill. App.3d 903, 12 Ill.Dec. 642, 370 N.E.2d 265 (1977); *Coleman v. State*, 264 Ind. 64, 339 N.E.2d 51 (1975); *State v. Houston*, 206 N.W.2d 687 (Iowa 1973); *State v. McGlynn*, 292 Minn. 405, 195 N.W.2d 583 (1972); *State v. Woods*, 346 Mo. 538, 142 S.W.2d 87 (1940); *State v. Crepeault*, 126 Vt. 338, 229 A.2d 245 (1967) *cert. den.*, 389 U.S. 915, 88 S.Ct. 249, 19 L.Ed.2d 267, *appeal dismissed*, 390 U.S. 38, 88 S.Ct. 833, 19 L.Ed.2d 813 (1968).

However, the appellant directs the court's attention to the case of *People v. Medina*, 41 Cal.App.3d 438, 116 Cal.Rptr. 133, 145 (1974), where the California Court of Appeals held "that a defendant is denied a fair trial if the prosecution's case depends substantially upon accomplice testimony and the accomplice is placed, either by the prosecution or the court, under a strong compulsion to testify in a particular manner." In *Medina*, the accomplice had been granted immunity from prosecution upon the express condition that her testimony "not materially or substantially change" from earlier tape-recorded statements she had given to law enforcement officials. 116 Cal.Rptr. at 141. The court found that by this arrangement the defendants had been "deprived of the fundamental right to a fair trial." *Id.*

The *Medina* rationale that where the promise of leniency is expressly conditioned upon the accomplice's testifying in a particular manner, the subsequent testimony of the accomplice is tainted, has received further extension in the case of *Franklin v. State*, 577 P.2d 860 (Nev.1978). In *Franklin* the accomplice, under the threat of a death sentence, agreed to testify against the defendant and after her conviction was allowed to plead guilty to second degree murder. The Nevada Supreme Court, in holding that "by bargaining for specific testimony to implicate a defendant, and withholding the benefits of the bargain until after the witness has performed," is a prosecutorial procedure "contrary to public policy, to due process, and to any sense of justice" (577 P.2d at 863), agreed not only with the *Medina* rationale, but also observed that

"As a matter of logic, if the circumstances of the plea bargain would reasonably cause the alleged accomplice to believe he must testify in a particular fashion, then a less explicit arrangement also violates the defendant's due process rights." *Id.* at 862.

The *Medina* and *Franklin* decisions are inapposite to this case. The facts of this case, when compared with the *Medina* and *Franklin* cases, clearly indicate that Gilberto Flores not only pled guilty prior to the appellant's trial, but had also been sentenced. The record below provides no basis for the appellant's assertion that the prosecution implicitly bargained for specific testimony from Gilberto Flores. On the con-

trary, the accomplice's own testimony is exemplary of the total absence of "undue compulsion to testify in a particular fashion."

"Q. Whether they go back into court when this trial is over and try to get your sentence reduced depends on how well you testify in this case. Is that true?

A. No."

Against this backdrop, it is the conclusion of the court that the accomplice was willing to render a full, fair and accurate account of the facts of the crime, and his subsequent testimony was therefore admissible.

Finally, the appellant urges the court to adopt Chief Justice Bakes' analysis in his special concurrence in the case of *State v. Goodrich, supra.* There, Chief Justice Bakes argued that the rule which permits a witness to testify concerning conversations had with a deceased person outside the presence of the defendant is an intrusion of the Sixth Amendment right of confrontation. Whatever the merits of appellant's request, the record reveals that the appellant failed to raise such an objection below. As stated in *State v. Chaffin,* 92 Idaho 629, 635, 448 P.2d 243 (1968), "[t]he question was not fairly before the trial court and therefore cannot be raised here."

Judgment of conviction affirmed.

BAKES, C. J., and BISTLINE and DONALDSON, JJ., concur.

SHEPARD, J., concurs in the result.